**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| ESTATE OF S.B., a Minor, by and through his Parents, Sheilonda Bacon and Albert Bacon, | : : : : |
| Plaintiff, | : Civil Action No. 17-07158 (FLW) (LHG) : |
| v. | : : |
| TRENTON BOARD OF EDUCATION and NEW JERSEY DEPARTMENT OF EDUCATION, | : **OPINION** : : |
| Defendants. | : : : |

**WOLFSON, United States District Judge:**

Presently before the Court are separate Motions to Dismiss filed by Defendants Trenton Board of Education ("BOE") and New Jersey Department of Education ("NJDOE") (collectively, "Defendants"), respectively. This action is brought by Sheilonda Bacon and Albert Bacon, the parents of S.B. ("Plaintiffs" or "Parents"), a minor who suffered from Proteus Syndrome, a severe congenital disorder, and who ultimately passed away from complications associated with the disease. Plaintiffs accuse Defendants of denying S.B. a Free and Appropriate Public Education ("FAPE"), mandated by the Individuals with Disabilities Act ("IDEA"), and bring claims under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA") (Count One), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504") (Count Two). Plaintiffs also bring a claim for retaliation under both the ADA and Section 504 (Count Three).

The facts underlying the education, or, more accurately, lack thereof, provided to S.B.

during his shortened life paint a picture of an abject failure to accommodate this special needs child. Unfortunately, however, Plaintiffs' claims cannot find relief from this Court. Because Counts One and Two fall outside the IDEA statute of limitations, they are dismissed. Because Plaintiffs failed to exhaust their administrative remedies with respect to Count Three, that claim is also dismissed. Defendants' Motions to Dismiss are therefore granted in their entirety.

## I.     BACKGROUND

### A. Statutory Background

Plaintiffs bring claims under the ADA and Section 504, two federal statutes that protect the interests of adults and children with disabilities. While Congress enacted the IDEA to be the primary statute under which a child with a disability (or his parents) could challenge the adequacy of his education, the ADA and Section 504 are additional avenues through which a party may bring FAPE-related claims against a school district. Indeed, the Supreme Court, in *Smith v. Robinson*, 468 U.S. 992, 1009 (1984), held that the IDEA was "the exclusive avenue" through which to bring FAPE claims, but Congress responded by amending the IDEA to clarify that "[n]othing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], title V of the Rehabilitation Act [including Section 504], or other Federal laws protecting the rights of children with disabilities." 20 U.S.C.A. § 1415(l). Nonetheless, Congress made clear that before plaintiffs can bring claims under the ADA or Section 504, they must exhaust their administrative remedies under the IDEA. *Id.*

The IDEA requires "states that receive federal education funding to ensure that disabled children receive a 'free appropriate public education.'" *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 425–26 (3d Cir. 2013) (quoting 20 U.S.C. § 1412(a)(1)); *see H.E. v. Walter D. Palmer Leadership Learning Partners Charter Sch.*, 873 F.3d 406, 408 (3d Cir. 2017). The IDEA

"protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012) (citation omitted).

To comply with the IDEA, "school districts must identify and evaluate all children who they have reason to believe are disabled under the statute." *Munir*, 723 F.3d at 426. To provide a FAPE, the school district must develop and administer an Individualized Education Program ("IEP") for each student that is classified as eligible for special education. *S.H. v. State–Operated Sch. Dist. of Newark*, 336 F.3d 260, 264 (3d Cir. 2003); *see C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 65 (3d Cir. 2010) ("The FAPE required by the Act is tailored to the unique needs of the child by means of an [IEP]."). "An appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *Cape Henlopen*, 606 F.3d at 65. While the school district is "not required to 'maximize the potential'" of each disabled student, *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (quoting *Bd. of Educ. Of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 197 n. 21 (1982)), it "must offer an IEP that is 'reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'" *Munir*, 723 F.3d at 426 (quoting *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 730 (3d Cir. 2009)). "Consistent with its obligation under IDEA, New Jersey has enacted statutes and regulations which require all local Boards of Education in the State to identify children between the ages of five and twenty-one who may need or benefit from special education." *L.P. v. Edison Bd. of Educ.*, 265 N.J. Super. 266, 273 (Law. Div. 1993) (citing N.J.S.A. 18A:46–6).

"The IDEA establishes a private cause of action against a school district that fails to abide by its legal obligations." *Cape Henlopen*, 606 F.3d at 66. In that regard, a "parent who believes that a school has failed to provide a FAPE may request [an administrative] hearing, commonly known as a due process hearing, to seek relief from the school district for its failure to provide a FAPE," and may appeal an adverse decision to federal district court. *Mary T. v. Sch. Dist. of Philadelphia*, 575 F.3d 235, 240 (3d Cir. 2009); *see Cape Henlopen*, 606 F.3d at 66 ("The parent or guardian of a minor student who is denied the rights and procedures set forth in the IDEA is afforded the opportunity to file an administrative complaint and to appeal an adverse determination to a federal district court."). In New Jersey, this process entails filing a complaint and request for a due process hearing with the New Jersey Department of Education ("NJDOE"). *See* N.J.A.C. 6A: 14–2.7(c); *Edison Bd. of Educ.*, 265 N.J. Super. at 273–74 ("[The] DOE has been established as the forum agency for handling 'due process' petitions to review local agency decisions and actions regarding the provision of a FAPE for handicapped children."). In special education cases, the due process hearing is conducted by an Administrative Law Judge in New Jersey's Office of Administrative Law ("OAL"). *Edison Bd. of Educ.*, 265 N.J. Super. at 274. The ALJ's decision on "the appropriateness of the IEP is final and binding on the parties and must be implemented without undue delay." *Id.*; *see* N.J.A.C. 6A: 14–2.7(g).

After the administrative process has been exhausted, aggrieved parties may either 1) appeal the ALJ's final decision by filing a civil action in state or federal court, 20 U.S.C.A. § 1415(i)(2), or 2) file suit under another statute, such as the ADA or Section 504, alleging a denial of a FAPE. *See* 20 U.S.C.A. § 1415(l).

**B.    Factual Background**

This case concerns the efforts of the parents of S.B., a minor diagnosed at birth with

Proteus Syndrome, to obtain a FAPE for their child. The condition caused S.B. to suffer from vascular malformations, lymphedema, and hypertrophy of his trunk, hands, fingers, and feet. Compl., at ¶ 26. S.B. also suffered from severe asthma. *Id.* at ¶ 27. In addition, S.B. suffered from chronic pain resulting from the hematomas caused by the vascular malformations, drainage from the lymphedema, extra weight caused by his enlarged extremities and trunk, and breathing difficulties due to asthma. *Id.* at ¶ 28.

In 2004, when S.B. turned four years old, his mother, Sheilonda, concerned about finding a suitable educational environment for her son, contacted BOE to inquire about registering S.B. for kindergarten for the 2005–2006 school year. *Id.* at ¶ 36. Beginning in September 2005 and continuing until mid-October 2005, on the recommendation of BOE, S.B. enrolled in a mainstream class at Parker Annex School, but stopped attending after falling ill. *Id.* at ¶ 45. At BOE's invitation, Parents attended an October 5, 2005 meeting to discuss whether the Parker Annex School was a suitable placement for S.B. *Id.* at ¶ 46. At this meeting, Parents authorized BOE to evaluate S.B. for special education services, *Id.* at ¶ 47, and from October 2005 until January 2006, an occupational therapist, physical therapist, social worker and neuropsychologist evaluated S.B. These professionals agreed that S.B. was eligible for special education and related services, including home instruction. *Id.* at ¶ 48. During this time, S.B. was not receiving any form of education. *Id.* at ¶ 49. In January 2006, S.B. was accepted into the Cappello School for the 2006–2007 school year. *Id.* at ¶ 50. On February 27, 2006, Parents attended a meeting with BOE to develop S.B.'s IEP, and the BOE social worker authorized home instruction for the remainder of the school year. *Id.* at ¶ 51–52. Despite this authorization, S.B. allegedly did not receive home instruction. *Id.* at ¶ 53.

S.B.'s time at Cappello did not go well. In September 2006, following an incident involving unwanted touching, S.B. became "hysterical" and was withdrawn from the school.

*Id.* at ¶ 55–56. BOE agreed that Capello was not a good fit for S.B. and agreed to find S.B. a more suitable placement. *Id.* at ¶ 58. From the fall of 2006 until May 2009, S.B.'s mother repeatedly contacted and/or attempted to make contact with representatives from BOE to inquire about S.B.'s educational placement. *Id.* at ¶ 58. S.B.'s mother also enlisted the assistance of her case manager from Mercer County Special Child Health Services, who contacted BOE representatives, offered advice on who to contact at BOE, and even counselled on how to ensure S.B.'s educational placement. *Id.* at ¶ 60.

Nonetheless, from 2006 to 2009, S.B. received "no educational placement, peer interaction, home instruction, and/or related services." *Id.* at ¶ 62. S.B.'s parents aver that they were under the impression that BOE was attempting to find a suitable placement for S.B. during this time when, in fact, its truant officer was leaving notes at the wrong address advising that S.B. needed to attend school. *Id.* at ¶ 63. S.B. finally re-registered for school when, in May 2009, Richard Rivera, BOE's Child Study Team Social Worker, advised S.B.'s mother that S.B. needed to do so. *Id.* at ¶¶ 65–66.

On May 22, 2009, the parties conducted another IEP meeting to determine S.B.'s education level and to discuss a suitable educational placement for him. *Id.* at ¶ 67. In the interim, S.B. was, once again, authorized to receive home instruction. *Id.* at ¶ 68. The May 22, 2009 IEP confirmed that S.B. had not been in a regular education program for almost four years, but, according to Plaintiffs, the IEP erroneously stated that S.B. had been receiving home instruction. *Id.* at ¶ 69. Parents also allege that the IEP falsely stated that S.B. was a hard- working student who did not present any behavioral issues in the classroom, had shown educational improvement but still needed reinforcement in various subjects, and enjoyed hands- on activities requiring him to use his hands on a daily basis. *Id.* at ¶ 70. S.B. finally began home instruction on June 5, 2009, which lasted three weeks until the school year ended,

but S.B. did not continue the course the following school year. *Id.* at ¶¶ 71–72.

In September 2009, S.B. was scheduled to be retested to ascertain his education level and to determine a suitable placement, but he fell ill and the testing date was never rescheduled. *Id.* at ¶¶ 73–74. S.B.'s mother spent the next two years attempting to contact Rivera and other BOE representatives in the hope of finding a suitable educational placement for S.B. *Id.* at ¶ 75. She also maintained regular contact with the case manager from Mercer County Special Child Health Services, who continued to offer advice and assistance to help S.B. find an educational placement. *Id.* at ¶ 77. Finally, in November 2011, the New Jersey Division of Youth and Family Services ("DYFS") was called into the home to investigate a complaint involving one of S.B.'s siblings. *Id.* at ¶ 81. DYFS learned that the only education S.B., who was then eleven years old, had received was three weeks of home instruction in June 2009. *Id.* at ¶ 82. BOE representatives soon contacted S.B.'s parents and advised that they would again have to re-register S.B. for school. *Id.* at ¶ 83. On February 15, 2012, S.B. was registered for school for the third time. *Id.* at ¶ 84.

An IEP meeting was held on March 7, 2012, the documentation for which reflected that S.B. had not been evaluated since 2006, when he was classified as Other Health Impaired, and that he had never attended a formal school program. *Id.* at ¶ 85. BOE further acknowledged that although S.B. was chronologically a fifth grader, his educational abilities were far below the fifth grade. *Id.* at ¶ 86. On January 2, 2013, S.B. began to attend the Kingsway Learning Center, where his education continued until his death on May 3, 2017, when he was sixteen years old. *Id.* at ¶ 25.

From 2012 until 2017, when S.B. attended Kingsway, he received two hours of home instruction with Michael Coe, a teacher within the BOE school district, five days per week during the school year. *Id* at ¶ 100. In November 2015, when S.B.'s parents were seeking

services for S.B.'s sibling, Monique Harvey, BOE's Supervisor of Special Education, who participated in both S.B.'s and his sibling's IEP meetings, allegedly disparaged Plaintiffs' efforts to obtain a FAPE for their child, stating "what do they want, everything?" Plaintiffs allege that in June 2016, shortly after Harvey made derogatory comments, BOE unilaterally revised S.B.'s IEP to discontinue his home instruction. *Id.* at ¶¶ 106–107. Plaintiffs also contend that Harvey, over the BOE superintendent's objections, prevented Coe from seeing S.B. *Id.* at ¶¶ 108–110.

In July 2016, S.B.'s parents filed an Emergent Due Process Petition to prevent BOE from stopping S.B.'s home instruction, but withdrew the petition when BOE agreed to delay any decision until an IEP meeting was held. *Id.* at ¶¶ 111–112. After BOE refused to offer S.B. home instruction at this IEP meeting, S.B.'s parents filed another due process petition on September 13, 2016. *Id.* at ¶¶ 113–114. The parties ultimately settled this case on January 11, 2017 in an agreement that authorized S.B. to continue with home instruction pending an updated educational evaluation and/or a judicial determination of the then pending Due Process petition, which formed the basis for this lawsuit. *Id.* at ¶ 116.

Plaintiffs contend that immediately after signing this agreement, BOE removed Coe as S.B.'s home instruction teacher without any warning, following through on threats that the BOE had allegedly been making over the preceding months. *Id.* at ¶ 117. Plaintiffs allege that BOE delayed S.B.'s evaluation by a number of months and also failed to promptly find S.B. a replacement teacher. *Id.* at ¶¶ 122–123. When they did find a teacher, S.B. was not provided with the two hours of home instruction that the IEP required. *Id.* at ¶¶ 122. Plaintiffs also complain that the evaluation, when it was conducted, was "generic" and "failed to provide guidance regarding S.B.'s need for continued home instruction and found Kingsway an appropriate placement for S.B., despite the parties agreeing in January 2017 that Kingsway

was no longer providing S.B. with an appropriate education." *Id.* at ¶127.

### C. Procedural History

On February 15, 2013, S.B.'s parents first filed suit before this Court against the BOE, NJDOE and the New Jersey Department of Health, Division of Family Health Services ("NJDOH"), alleging violations of the IDEA, ADA, Section 504, the U.S. and New Jersey Constitutions, and New Jersey education statutes. This case was voluntarily dismissed without prejudice. *S.B. ex rel. A.B. v. Trenton Sch. Dist.*, No. 13-949, 2013 WL 6162814, at *7 (D.N.J. Nov. 25, 2013). Plaintiffs filed an Amended Complaint on February 4, 2014; however, the Court dismissed that case due to Plaintiffs' failure to exhaust their administrative remedies. *S.B. v. Trenton Bd. of Educ.*, 2014 WL 5089716 at *6 (D.N.J. Oct. 9, 2014).

On October 27, 2014, Plaintiffs filed a Due Process Petition against BOE and NJDOE before the Office of Administrative Law. Certification of Cherie L. Adams ("Adams Cert."), Exhibit A at 2. On June 7, 2016, Administrative Law Judge ("ALJ") John S. Kennedy granted NJDOE's motion for summary decision of Plaintiffs' claims pursuant to the IDEA's two-year statute of limitations. *Id.* at 12–13. The ALJ partially denied the BOE's motion for summary decision, finding that disputed issues of fact existed about whether the exceptions to the IDEA statute of limitations applied.[1] *Id.* at 14–15. The matter then proceeded to discovery, but, due to S.B.'s unfortunate passing, ALJ Sarah G. Crowley entered a final decision dismissing the administrative action on the grounds of mootness. Adams Cert., Exh. B at 2. Plaintiffs filed the

---

[1] BOE appears to argue that the ALJ's determination of the discovery date related to the statute of limitations should be given preclusive effect, and Plaintiff appears to argue that preclusive effect should instead be given to the ALJ's findings regarding the exceptions to the statute of limitations. However, these "argument[s] fail[ ] to take into account the disparate burdens of proof in the administrative proceedings vis-a-vis the present proceeding. Because of that, issue preclusion does not apply in this case." *Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 537 F. App'x 90, 95 (3d Cir. 2013).

instant lawsuit on September 15, 2017.

## II.    LEGAL STANDARD

Although Plaintiffs request that the Court apply modified *de novo* review of the ALJ's decision, the Complaint does not contest the findings made during the administrative process. Under normal circumstances, any party "aggrieved by the findings and decision" of the hearing panel may appeal the decision to a United States District Court. 20 U.S.C. § 1415(i). The district court then applies a "modified *de novo*" standard of review to the hearing panel's decision. *S.H. v. State–Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). Here, however, the case proceeded to discovery after ALJ Kennedy's initial decision, but S.B.'s death prompted ALJ Crowley to dismiss the case as moot. Plaintiffs then brought new claims here, alleging violations of the ADA and Section 504.[2] In the present matter, Defendants move to dismiss these claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted). While Federal Rule of Civil Procedure 8(a)6 does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

---

[2] The parties have not briefed whether a party must appeal an administrative decision to state or federal court before filing a FAPE claim under the ADA or Section 504. A plain reading of the IDEA would suggest that a party is not required to do so. Absent any briefing from the parties, the Court does not address the propriety of Plaintiffs' filing this suit under the ADA and Section 504 without first appealing the ALJ decision.

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Thus, to survive a Rule 12(b)(6) motion to dismiss, the Complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the "plausibility standard is not akin to a 'probability requirement,'…it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine whether a plaintiff has met the facial plausibility standard mandated by *Twombly* and *Iqbal*, courts within the Third Circuit engage in a three-step progression. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the reviewing court "outline[s] the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id.* Finally, where "there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. This last step of the plausibility analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III.   <u>STATUTE OF LIMITATIONS</u>

Although S.B. asserts claims under the ADA and Section 504, which do not have their own statute of limitations provisions, "the IDEA's two-year statute of limitations applies to

claims made for education under § 504 of the Rehabilitation Act," *P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 737 (3d Cir. 2009). That is, because "[t]he IDEA and § 504 of the Rehabilitation Act do similar statutory work," and the Third Circuit has explained that "applying the state statute of limitations could frustrate federal policy" in the area of education for children with disabilities. *Id.* at 736. In *P.P.*, the court found "[a]ll of the plaintiffs' § 504 claims [to be] premised on their IDEA claims," and concluded that "[i]t does not make sense that the virtually identical claims made under these two statutes would be treated differently from a statute-of- limitations perspective." *Id.*; *see also Barker v. Our Lady of Mount Carmel Sch.*, No. 12-4308, 2016 WL 4571388, at *9 (D.N.J. Sept. 1, 2016) (applying IDEA statute of limitations to ADA claim). Here too, Plaintiffs' claims under § 504 and the ADA are entirely premised on S.B.'s entitlement to services under the IDEA. Accordingly, like in *P.P.*, the IDEA provides the closest analogy for both the § 504 and the ADA claims, and supports the same federal policies. *See P.P.*, 585 F.3d at 735. The IDEA's two-year statute of limitations therefore applies to Plaintiffs' claims.

### A. Discovery Date of Alleged FAPE Violations

The parties dispute the date on which the IDEA's two-year statute of limitations began running. The Third Circuit in *G.L. v. Ligonier School District Authority* clarified that under the IDEA, the statute of limitations "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation— whichever comes first." 802 F.3d 601, 614 (3d Cir. 2015) (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010)); *see also* 20 U.S.C. § 1415(f)(3)(C). Importantly, the IDEA statute of limitations is not subject to equitable tolling principles, including the continuing violation doctrine. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 248 (3d Cir. 2012).

Application of the IDEA statute of limitations is a highly factual determination that

a court must make on a case-by-case basis. *J.L. ex rel. J.L. v. Ambridge Area Sch. Dist.*, 622 F.Supp.2d 257, 266 (W.D. Pa. 2008) (citing 71 Fed. Reg. 46540-01 at 46704-06 (August 14, 2006) (codified at 34 C.F.R. § 300.511)); *see also Swope v. Cent. York Sch. Dist.*, 796 F.Supp.2d 592, 605 (M.D. Pa. 2011). District courts within the Third Circuit, applying the IDEA's discovery rule, have generally focused on certain action or inaction by a school district in determining whether a reasonable parent was sufficiently alerted to the fact that his or her child would be appropriately accommodated. *See, e.g., E.G. v. Great Valley Sch. Dist.*, No. CV 16- 5456, 2017 WL 2260707, at *9 (E.D. Pa. May 23, 2017); *B.B. by & through Catherine B. v. Del. Coll. Preparatory Acad.*, No. 16-806, 2017 WL 1862478, at *3 (D. Del. May 8, 2017); *Solanco Sch. Dist. v. C.H.B.*, No. 15-02659, 2016 WL 4204129, at *7 & n.10 (E.D. Pa. Aug. 9, 2016).

Here, Plaintiffs' proffered discovery date—November 2011—is implausible based on the timeline that Plaintiffs themselves have set forth in the Complaint.[3] Parents first removed their son from Parker Annex School in October 2005 after determining that mainstream schooling was not suitable for him. Then, from October 2005 until January 2006, Trenton's occupational therapist, physical therapist, social worker, and neurophysiologist all evaluated S.B., and "agreed that S.B. was eligible for special education and related services." *Id.* at ¶ 48. On February 27, 2006, S.B.'s parents met with Trenton to develop an IEP, wherein the school board authorized S.B. to receive home instruction. *Id.* at ¶51-52. By law, this IEP is required to contain "statements concerning a disabled child's level of functioning, set forth measurable

---

[3] Plaintiffs only allege a single FAPE violation occurred over a nine-year period from 2003 until 2012. Plaintiffs allege that BOE failed to provide S.B. with all services to which he was entitled during this period. Compl., at ¶¶ 143, 156. Because separate discovery dates are only applicable in circumstances when plaintiffs assert multiple FAPE violations, the statute of limitations for the entire seven-year period begins to run at the earliest moment that Plaintiffs were put on notice of the alleged FAPE violation.

annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *Cape Henlopen*, 606 F.3d at 65.

By February 2006, then, Parents were well aware that S.B.'s condition would seriously complicate efforts to provide S.B. a mainstream education, and they had received extensive reports from professionals detailing the basis for S.B.'s eligibility for special education and home instruction. At that time, S.B.'s parents understood BOE's obligations to provide S.B. with a FAPE, and were on notice that that BOE had allegedly not fulfilled these duties. What is more, it immediately became clear after the 2006 IEP meeting that BOE continued to violate its obligations, as S.B. allegedly did not receive any instruction for the remainder of the 2006 school year, *id.* at ¶¶ 52–53, and furthermore, received no instruction until 2009. *Id.* at ¶ 62. Under the reasonable parent standard, the February 2006 IEP meeting clearly put Parents on notice of BOE's alleged FAPE violations.[4]

The case *Brady P. by Beth v. Central York School District* is instructive. No. 16-2395, 2018 WL 1367325 (M.D. Pa. Mar. 16, 2018). In *Brady P.*, the court found that the parents of a child with developmental disabilities "knew or should have known" that the school was failing to provide their child a FAPE from the date that an IEP meeting revealed the extent of the child's disabilities. *Id.* at *8. The court concluded that this notice date was proper even though the parents alleged that the school failed to rectify the FAPE violations after the meeting. As the court explained, "Parents were not required to 'predict' that [the child] would not improve" following the IEP meeting. Rather, "[a]t that time, reasonably diligent parents…were on notice of possible existing injury to their child which may have also been ongoing." *Id.* Similarly, here, S.B.'s parents were on notice from the date of the 2006 IEP

---

[4] Indeed, Plaintiffs were on notice of BOE's alleged FAPE violations every subsequent year that S.B. did not receive an education.

meeting, of the full extent of S.B.'s disabilities. *See also Solanco*, 2016 WL 4204129, at *6 (finding that there was "no doubt that the Parent knew" that her child would not be accommodated after a meeting where the school district could not provide assurances that it would accommodate the child's disability).

There is no merit to Plaintiffs' argument that the proper discovery date should be November 2011.[5] By the time the DYFS officer learned of S.B.'s situation and began the process of finding a school placement in November 2011, S.B. had received almost no schooling for the previous five years. That truant officers allegedly delivered notices alerting that S.B. needed to attend school to the "wrong address," cannot have, as Plaintiffs claim, deprived them of notice. Compl., at ¶63. During that time, Plaintiffs understood the gravity of the situation, as they admit that they "repeatedly contacted and/or attempted to make contact with representatives from BOE to inquire about S.B.'s educational placement." Compl., at ¶ 58. Indeed, Parents were on notice when the school district failed to meet its IDEA obligations. The Court, therefore, finds that the statute of limitations began to run on February 27, 2006, and Plaintiffs were required to bring their claims for denial of a FAPE by February 27, 2008.

## B.  Exceptions to IDEA Statute of Limitations

Alternatively, Plaintiffs argue that, even if their claims fall outside the IDEA statute of limitations period, they are not time-barred because the exceptions to the statute of limitations

---

[5] The Court notes that even if this were the correct notice date, it is arguable that Plaintiffs' claims would still fall outside the statute of limitations. The IDEA requires that a party bring a due process complaint as part of the administrative process within two years, but plaintiffs did not file the complaint until October 2014. The Court notes that while Plaintiffs filed an initial complaint before this Court on February 25, 2013 and an amended complaint on February 4, 2014, these cases were then dismissed when the Third Circuit issued a decision, unrelated to this case, clarifying that a party asserting a FAPE claim must first exhaust its administrative remedies. It is possible that the doctrine of substantial compliance could allow Plaintiffs to use 2013 as the filing date, but the Court need not reach the issue, as I find that the notice date was February 2006.

(i.e. its tolling provisions) apply. The IDEA provides that the two-year statute of limitations "shall not apply to a parent if the parent was prevented from requesting the hearing due to (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent." 20 U.S.C.A. § 1415(f)(3). Courts are clear that "[e]stablishing evidence of specific misrepresentations or withholding of information is insufficient to invoke the exceptions; a plaintiff must also show that the misrepresentations or withholding caused her failure to request a hearing or file a complaint on time." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 246–47 (3d Cir. 2012). Because NJDOE and BOE assert different defenses to these claims, I will address each separately.

### a.   New Jersey Department of Education

Plaintiffs argue that the exceptions to the statute of limitations apply to NJDOE even though these provisions appear not to cover state educational agencies ("SEAs"). As I have explained in the October 9, 2014 opinion, it is "unlikely that this statutory exception to the IDEA statute of limitations applies to Plaintiffs' claims against [NJDOE]" because the provisions' plain language only references the "local educational agency" ("LEA"). *S.B. v. Trenton Bd. of Educ.*, No. 13-0949, 2014 WL 5089716, at *7 (D.N.J. Oct. 9, 2014). LEA is defined in the IDEA as, generally, "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools...." 20 U.S.C. § 1401(19)(a). In contrast, a "State educational agency" is defined as "the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools." *Id.* at § 1401(32). In fact, Plaintiffs acknowledge

these distinctions in the Complaint, describing BOE as a "Local Educational Agency" and NJDOE as a "State Educational Agency." Compl., at ¶¶ 4, 6.

Despite recognizing the LEA/SEA distinction, Plaintiffs argue that the NJDOE should nonetheless be treated as an LEA for purposes of the statute of limitations exceptions based on its "day-to-day involvement with Defendant BOE and its knowledge of Defendant BOE's inability or unwillingness to provide FAPE to special needs children, including S.B." ECF No. 25 at 14. Plaintiffs have not cited to any authority for extending the statute of limitations exceptions to SEAs that are closely involved with LEAs, but have instead referenced cases holding that the "SEA by statute must step in where a LEA cannot or will not provide a child with FAPE." *H.E. v. Walter D. Palmer Leadership Learning Partners Charter Sch.*, 220 F. Supp. 3d 574,587 (E.D. Pa. 2015) (citing *Charlene R. v. Solomon Charter School*, 63 F. Supp. 3d 510,516 (E.D. Pa. 2004). These cases, however, stand only for the proposition that a SEA must provide a FAPE to a child when it knows that an LEA is failing to do so; they offer no support for Plaintiff's argument that SEAs should be treated as LEAs for the purposes of the IDEA statute of limitations. Rather, where the issue has arisen, at least one court has taken the opposite approach. *See, e.g.*, *Jenkins v. Butts Cty. Sch. Dist.*, No. 15-CV-30, 2016 WL 740461, at *6 (M.D. Ga. Feb. 24, 2016) (noting that SEA's alleged misrepresentation did not create exception to statute of limitations).

Even accepting Plaintiffs' interpretation of these cases, the Complaint fails to allege that NJDOE knew of BOE's alleged inability or unwillingness to provide a FAPE *to S.B.* Plaintiffs reference reports purportedly showing that NJDOE knew of several of BOE's longstanding issues with the provision of FAPE. They allege, for example, that it was widely known that students with disabilities were not receiving the services mandated by their IEPs, that students were not receiving their authorized home instruction, and that instructors were

producing inaccurate records of the time they spent with their students. Compl., at ¶¶ 133–135. Plaintiffs also assert that in 2010, NJDOE assigned a State fiscal monitor to oversee BOE activities, which had veto power over school board decisions and advised on the creation of a new position to fix "the pervasive management problems in Defendant BOE's special education department." Compl., at ¶ 136–137. These allegations suggest that NJDOE at various times in the past was *generally aware* of inadequacies, indeed substantial inadequacies, in BOE's provision of a FAPE to disabled students, but nowhere do Plaintiffs allege that NJDOE had specific awareness that BOE was denying S.B. a FAPE. Indeed, even in the cases cited by Plaintiff, a SEA has only been obligated to step in on behalf of LEAs when it was abundantly clear that the LEA was incapable of providing a FAPE to the student at issue in the lawsuit. *See, e.g.*, *H.E.*, 220 F. Supp. at 586–87 (holding that "where the LEA has *ceased to exist*, a parent may look to the SEA to vindicate their child's right to FAPE") (emphasis added). Accordingly, the statute of limitations exceptions do not apply to NJDOE; Counts One and Two are dismissed with respect to NJDOE.

### b.  Trenton Board of Education

There is no dispute that the Trenton BOE is an LEA and therefore subject to the tolling provisions of the IDEA. Plaintiffs allege that both of these tolling provisions apply to BOE's conduct, entitling them to bring these FAPE claims outside the statute of limitations period. First, Plaintiffs allege that BOE made specific misrepresentations that it had resolved the problem forming the basis of the complaint; and second, they contend that BOE withheld information from Plaintiffs about S.B.'s status.

In the first instance, the purported misrepresentations are insufficient to toll the statute of limitations because there is no indication that they left S.B.'s parents unaware of their rights under the IDEA. Plaintiffs claim that BOE's statements in S.B.'s IEP meetings and in the IEP

itself caused them to believe that the school board was addressing their concerns. For instance, they assert that the May 22, 2009 IEP confirmed that S.B. had not been in a regular education program for almost four years, "but falsely claimed that he had been receiving [home instruction]" and "further fabricated that S.B. was a hard-working student who did not present any behavioral issues in the classroom, had shown educational improvement but still needed reinforcement in various subjects, and enjoys hands-on activities requiring him to use his hands on a daily basis." Compl., at ¶ 70. But, Plaintiffs' own Complaint belies any argument that these misrepresentations caused S.B.'s parents to believe that BOE intended to rectify its failure to provide S.B. a FAPE. Indeed, S.B. was withdrawn from school shortly after BOE made these statements, and Plaintiffs allege that BOE made no efforts to provide S.B. any sort of education. At that moment, Plaintiffs should have been aware of BOE's violations, and could have then filed their due process complaint.

Second, Plaintiffs also fail to allege any facts indicating that BOE withheld information that it was required by statute to disclose. As an initial matter, the text of the "withholding information" exception explicitly applies only to the failure to disclose information required under the IDEA. See 20 U.S.C. § 1415(f)(3)(D)(ii) (referring to the withholding of information "required under this subchapter"). In other words, Plaintiffs can satisfy this exception only by showing that the school failed to provide them with a written notice, explanation, or form specifically required by the IDEA statutes and regulations. Plaintiffs, however, have not pointed to any statutorily required information that Defendants failed to disclose.

Even the facts that Plaintiffs do allege fail to demonstrate that BOE withheld information that would have allowed Plaintiffs to file the due process complaint on time. Parents merely assert that they "repeatedly contacted and/or attempted to contact BOE representatives to inquire about S.B.'s educational placement," but received no response until

May 2009 when a BOE social worker advised Parents that SB needed to re-register for school. (Compl., at ¶¶ 58, 65). But, as already explained at length, BOE neglected to provide *any of the services* that BOE was allegedly obligated to provide for S.B. Additionally, Plaintiffs also enlisted professional assistance from S.B.'s case manager from Mercer County Special Child Health Services, "who contacted representatives from Defendant BOE, advised [S.B.'s mother] on who to contact at Defendant BOE, and even advised on how best to proceed to ensure S.B.'s educational placement." *Id.* at ¶ 60. This assistance continued even after S.B. briefly attended school in 2009, up until he began receiving home instruction in 2012. Having had this information and support through the entire period of BOE's alleged FAPE violations, Plaintiffs cannot (and do not) plausibly plead that BOE's withholding of information caused them to file an untimely complaint. Because BOE's actions or omissions did not trigger the IDEA's tolling provisions, Counts One and Two are also dismissed against BOE.

## IV.   **FAILURE TO EXHAUST RETALIATION CLAIM**

Plaintiffs' claim for retaliation under the ADA, although not time-barred, has not been administratively exhausted. Generally, "a plaintiff who seeks relief available under the IDEA must exhaust his administrative remedies before filing a lawsuit...." *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 131 (3d Cir. 2017); *see also* 20 U.S.C. § 1415(i)(2)(A) (providing a cause of action to those "aggrieved" by a "final" decision of the due process hearing officer or state educational agency). "Exhaustion of the IDEA's administrative process is also required in non- IDEA actions where the plaintiff seeks relief that can be obtained under the IDEA." *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014). "Determining if the IDEA's administrative process must be exhausted before bringing claims in federal court turns on whether the parties could have asserted the claims under the IDEA. Intertwined with this inquiry is whether the claim could have been remedied by the IDEA's administrative process."

*Id.* at 273; *see also Jeremy H. v. Mt. Lebanon Sch. Dist*., 95 F.3d 272, 283-84 (3d Cir. 1996) (claims arising after conclusion of the administrative hearing and claims not raised in that hearing must be exhausted).

Courts have repeatedly held that retaliation claims like the ones Plaintiffs assert here could have been asserted under the IDEA and, thus, must be administratively exhausted. *Batchelor*, 759 F.3d at 274 ("Appellants' retaliation claims asserted under Section 504 of the Rehabilitation Act and ADA 'relate unmistakably' to the provision of a FAPE…and are thus subject to the IDEA's exhaustion requirement) (quoting *Rose v. Yeaw*, 214 F.3d 206, 210 (1st Cir. 2000)); *S.D. by A.D. v. Haddon Heights Bd. of Educ.*, 722 F. App'x 119, 126 (3d Cir. 2018) (finding retaliation claims are subject to the IDEA exhaustion requirement).

Here, the allegations at the core of the retaliation claim—that BOE stopped home instruction and replaced S.B.'s teacher in response to Plaintiffs' efforts to protect S.B.'s rights under the IDEA—"relate unmistakably" to the provision of FAPE and are thus subject to the IDEA exhaustion requirement. Plaintiffs neither argue that they have exhausted their administrative remedies with respect to the retaliation claim, nor do they argue that any exceptions to the exhaustion requirement apply.[6] Accordingly, Count Three is dismissed against NJDOE and BOE due to Plaintiffs' failure to exhaust administrative remedies.

## V.   **CONCLUSION**

---

[6] There are four exceptions to the exhaustion requirement: "(1) exhaustion would be futile or inadequate; (2) the issue presented is purely a legal question; (3) the administrative agency cannot grant relief; and (4) exhaustion would cause severe or irreparable harm." *D.E. v. Cent. Dauphin Sch. Dist*., 765 F.3d 260, 275 (3d Cir. 2014). The party seeking to be excused from exhaustion bears the burden of establishing an exception. *See Honig v. Doe*, 484 U.S. 305, 327. (1988); *M.M. v. Paterson Bd. of Educ.*, No. 17-3802, 2018 WL 2474174, at *2 (3d Cir. June 4, 2018). Plaintiffs have not argued that any of these exceptions apply and, thus, have not carried their burden.

Clearly, dismissal of Parents' claims is a sad and unsatisfying ending to a difficult pursuit of education for the now deceased, special needs child, S.B. There can be no satisfaction or vindication for anyone, yet, for the foregoing reasons, Defendants' Motions to Dismiss are granted in their entirety.

Dated:  June 28, 2018                                   /s/ Freda L. Wolfson
                                                        Hon. Freda L. Wolfson
                                                        United States District Judge